26CA0011 Peo in Interest of OLJ 07-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 26CA0011
Mesa County District Court Nos. 23JV41 & 24JV25
Honorable Craig P. Henderson, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of O.L.J. and A.T., Children,

and Concerning J.R.T.,

Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE LIPINSKY
Yun and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 30, 2026

---

Todd M. Starr, County Attorney, John Rhoads, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Josie L. Burt, Guardian Ad Litem

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     J.R.T. (father) appeals the judgment terminating his parent-child legal relationship with O.L.J. and A.T. (the children).  We affirm.

## I.     Background

¶ 2     The Mesa County Department of Human Services (the Department) filed a petition in dependency or neglect concerning then fourteen-day-old A.T.  The petition alleged substance use by mother during her pregnancy and that A.T. tested positive for methamphetamine at birth.  A.T. has high special needs; she experiences severe emotional dysregulation and sensory overload that lead to emotional breakdowns and tantrums that can last for hours at a time.  She requires extensive therapy and care.

¶ 3     The court awarded temporary custody of A.T. to the Department, which placed her with father.  Four months later, however, father was arrested for a protection order violation, and the Department moved A.T. into a certified foster home.

¶ 4     Father entered a no-fault admission, and the juvenile court adjudicated A.T. dependent or neglected.  The court then adopted a treatment plan for father that required him to (1) attend family time and demonstrate an ability to understand and meet A.T.'s needs;

(2) complete an assessment and follow reasonable recommendations to address all identified substance abuse and mental health issues; (3) follow the requirements of his probation and criminal case; and (4) comply with a case management objective.

¶ 5     Nearly one year later, the Department filed a separate petition in dependency or neglect concerning then eighteen-day-old O.L.J. The petition alleged that O.L.J. had also tested positive for methamphetamine at birth.  Like A.T., O.L.J. has high special needs.  He was diagnosed with a rare enzyme disorder that prevents his body from breaking down most sugars that occur naturally in many foods.  Untreated, this disorder causes extreme gastrointestinal issues, and he must adhere to a very restricted diet and take expensive medication.  Moreover, like A.T., O.L.J. has issues with emotional dysregulation and overstimulation.

¶ 6     Father entered a no-fault admission as to O.L.J., and the juvenile court adjudicated O.L.J. dependent or neglected.  The court then adopted the same treatment plan for father as in A.T.'s case.

¶ 7     The juvenile court subsequently amended father's treatment plans to require him, as relevant here, to (1) complete thirty-six

sessions of substance abuse therapy; (2) "complete a hair follicle test"; and (3) attend all medical and therapy appointments. Later, the court further amended father's treatment plans, requiring him to complete a "[c]apacity to [p]arent" evaluation and follow all reasonable recommendations of the evaluation.

¶ 8 The Department then moved to terminate father's parental rights regarding both children, and the juvenile court scheduled a joint termination trial. Following a two-day trial, the juvenile court terminated father's parental rights. As relevant to this appeal, the court found that, although father made some progress, he failed to comply with some components of his treatment plans and was unfit and unlikely to become fit within a reasonable time.

## II. Termination Criteria and Standard of Review

¶ 9 To terminate a parent-child legal relationship, the juvenile court must find by clear and convincing evidence that (1) the child has been adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 10    A treatment plan seeks to preserve the parent-child legal relationship by helping the parent overcome the problems that required government intervention. *K.D. v. People*, 139 P.3d 695, 699 (Colo. 2006). A plan is successful if it renders a parent fit or corrects the conduct or condition that led to the intervention. *People in Interest of C.A.K.*, 652 P.2d 603, 611 (Colo. 1982).

¶ 11    When a child is under six years old, as in this case, the juvenile court must consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025. In such cases, the court may not find that a parent is in reasonable compliance with, or has been successful at, a treatment plan if the parent (1) exhibits the same problems addressed in the treatment plan without adequate improvement and (2) is unable or unwilling to provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. § 19-3-604(1)(c)(I)(B).

¶ 12    A parent is unfit if the parent's conduct or condition renders them unable or unwilling to give their child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App.

2007). "The reasonable parental care standard requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs." *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 13   When deciding whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24, 524 P.3d 1209, 1216. What constitutes a reasonable time is fact-specific and must be determined by considering the child's physical, mental, and emotional conditions and needs. *Id.* at ¶ 25, 524 P.3d at 1216. But a "reasonable time" is not an indefinite time. *Id.* (quoting *A.J.*, 143 P.3d at 1152). And even when a parent has made progress, the court is not required to give the parent additional time to become fit. *See id.* at ¶¶ 24-25, 524 P.3d at 1216.

¶ 14   Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v.*

5

*T.M.*, 2021 CO 14, ¶ 15, 480 P.3d 682, 686. We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10, 486 P.3d 1201, 1204-05.

### A. Treatment Plan Compliance

¶ 15 Father argues that the juvenile court erred by finding that he failed to comply with his treatment plans. We disagree.

¶ 16 As an initial matter, father implies that certain conditions in the treatment plans were inappropriate. But other than asserting that hair follicle testing was unnecessary and that he had previously completed substance use treatment, he does not develop any argument that the treatment plans were not appropriate. We therefore will not address the appropriateness of the plans. *S.Z.S.*, ¶ 29, 524 P.3d at 1217 (declining to address assertion not developed with factual or legal argument).

¶ 17 In considering father's compliance with the treatment plans, the juvenile court acknowledged that he consistently engaged in family time, complied with the case management requirement, and adhered to the conditions of probation. But the court found that father had not reasonably complied with the treatment plans

because (1) father had not completed substance abuse treatment or hair follicle testing; (2) his attendance at the children's medical and therapy appointments "was inconsistent at best"; and (3) he had "an unfortunate tendency to minimize [the] children's needs." The court concluded that father had "no real plan to take care of these high needs children, and it would take years for [father] to become fit."

¶ 18 The record supports the court's findings. The caseworker testified that the assessment recommended "around [thirty] sessions of substance abuse therapy." But those sessions had not been "completed", "started", or even "scheduled." The caseworker explained that hair follicle testing had been ordered because father did not like the frequency of urinalysis (UA) testing, and the Department agreed to reduce UA frequency if father took a hair follicle test. The caseworker also testified that the Department requested hair follicle testing because it was not receiving UA results "in a timely manner" and was therefore unable "to verify sobriety." The caseworker authorized hair follicle testing fourteen months before the termination hearing and spoke with father "[s]everal times" about the "importance and agreement of completing the hair follicle," but father did not complete it.

¶ 19   Father testified that he did not have an issue with hair follicle testing, but that he "really did forget." *See People in Interest of K.T.*, 129 P.3d 1080, 1082 (Colo. App. 2005) (concluding that mother's refusal to submit to UA testing showed she was not committed to meeting the child's needs and was unfit); *People in Interest of M.H-K.*, 2018 COA 178, ¶ 69 n.5, 433 P.3d 627, 638 n.5 (noting that father's noncompliance with court-ordered drug testing was "objectively unreasonable").

¶ 20   Next, the caseworker testified that father inconsistently attended the children's medical and therapy appointments. Specifically, the caseworker testified that father did not "participate in all medical and therapy appointments that [father was] able to," and clarified that she was not referring to "the ones that [were] in the foster placement's home." Foster mother testified that father attended many therapy appointments in the beginning, but that, for unknown reasons, "[h]e ha[d]n't attended in several months." She explained that although father was not allowed in the foster home for in-home therapy, some of the therapies were at a facility in Fruita. And at least one of the children "attend[ed] a doctor's appointment every single month" at either the pediatrician's office

8

in Grand Junction, at Children's Hospital in Denver, or via telehealth. Father testified that it had "been at least three months, maybe four" since he had last attended a therapy appointment. Father also testified that he stopped going to medical appointments a year before the termination hearing because he "[d]idn't really agree with the doctor."

¶ 21 The children's pediatrician described the children's needs and opined that the children "definitely" had greater needs than those of an average child. The pediatrician testified that it was "not clear" that father had "knowledge and understanding of the needs of the[] children." When with the children, father exposed them to "increased overstimulation[,] which ma[de] it very difficult for [the children] to move forward with their therapy sessions." And therapists reported "that they were not able to make headway when [father] was in attendance."

¶ 22 The family time supervisor testified that parenting the children alone would be "too much" for father. Foster mother testified that she was "not sure that [father] understands [the children's] medical and emotional needs and physical needs." The caseworker testified that she was concerned "about [father]'s minimization of the

children's needs." Father did not "see what the doctors or therapists [were] seeing" and "believe[d] that everything [was] fine." The caseworker concluded that father was unable to meet the children's needs.

¶ 23 Father argues that the record did not support the juvenile court's finding that he did not follow the capacity to parent recommendations, including fetal alcohol spectrum disorder (FAS) "training through [Dominica] Steele," a FAS expert, and sobriety groups. The caseworker testified that father completed the capacity to parent evaluation but did not follow through on its recommendations. The caseworker explained that she spoke with father about scheduling a training with Steele, but she did not "know if that got completed or not," only that it had been set up.

¶ 24 Father indeed testified that he "learned . . . about fetal alcohol syndrome" through "Dominic Castile." However, the caseworker testified that she reached out to the FAS expert and to father's parent advocate for verification but had not received a response. And the case management objective of the treatment plans noted that "the burden [was] on [father] to comply with this plan and

advise [the Department] of the steps taken by [father] in compliance."

¶ 25    In discussing sobriety groups, the caseworker testified that father "explained to [the caseworker] that he doesn't like participating in groups like that." In his opening brief, father asserts that he believed attendance at sobriety group meetings would be "too risky for him" because "being around other people" was a "trigger" for him. The record does not support this statement, however. Father testified that he did not attend such meetings because he "[d]idn't really care to be involved in all that discussion[]." He said that participating in a sobriety group did not assist him in keeping sober because "a lot of times" the participants in the group "just talk about war stories and stuff like that." In any event, father's treatment plans did not allow him to disregard the requirement that he complete thirty-six sessions of substance abuse therapy because he thought he could maintain sobriety without attending a support group.

¶ 26    Based on these facts, the caseworker opined that father had not complied with his treatment plans and that the plans had not

11

been successful in rehabilitating him.  Because the record supports this conclusion, the juvenile court did not err in so finding.

## B.    Fitness

¶ 27    For similar reasons, we reject father's contention that the juvenile court erred by finding that he was unfit and could not become fit within a reasonable time.  Father argues that he complied with his treatment plans and demonstrated that he understood and could meet the children's needs.  But despite noting some treatment plan compliance, the juvenile court found otherwise, especially in light of the expedited permanency planning provisions.  In particular, the court found that father was "not ultimately willing or able to meet the significant needs of [the] children without significant help" and that "[t]wo and a half years of [father]'s lack of effort makes it clear that he [was] unlikely to change his conduct or condition within a reasonable time."

¶ 28    Again, the record supports the court's findings.  As noted above, the record contained testimony that father could not meet the children's extraordinary needs, and the caseworker opined that father was not a fit parent.  The caseworker testified that this was "an expedited case," father might become a fit parent in years, but

12

that waiting such a long time for father to become fit would not be "fair to the children."

¶ 29 Thus, because the record supports the juvenile court's determinations that father was unfit and unlikely to become fit within a reasonable time, we discern no error.

## C. Conclusion

¶ 30 Because the court's findings enjoy record support, the court did not err by concluding that father did not comply with his treatment plans and was unfit. In the absence of error, we need not consider father's contention that we should apply the constitutional harmless error standard of reversal. *See People in Interest of T.M.S.*, 2019 COA 136, ¶¶ 25-26, 454 P.3d 375, 381 ("[The] supreme court has not addressed whether the constitutional harmless error standard applies with respect to a parent's constitutional rights in dependency or neglect proceedings.").

## III. Ineffective Assistance of Counsel

¶ 31 Father alleges that his counsel provided ineffective assistance because counsel failed to raise a purported lack of compliance with the Indian Child Welfare Act (ICWA) and reasonable efforts. We are not persuaded.

13

## A.    Applicable Law

¶ 32    A parent has a statutory right to appointed counsel in dependency and neglect proceedings.  §§ 19-1-105(2), 19-3-202(1), C.R.S. 2025.  A parent's statutory right to counsel includes the right to effective assistance of counsel.  *A.R. v. D.R.*, 2020 CO 10, ¶ 47, 456 P.3d 1266, 1278.

¶ 33    When evaluating ineffective assistance of counsel claims in dependency and neglect proceedings, we apply the same test as in criminal cases.  *See id.* at ¶¶ 48, 60, 456 P.3d at 1278, 1280 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  Under this test, to establish an ineffective assistance claim, the parent must show that (1) counsel's performance was outside the wide range of professionally competent assistance, and (2) the parent was prejudiced by counsel's deficient performance — that is, there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the proceeding would have been different.  *Id.* at ¶¶ 48-49, 60, 456 P.3d at 1278, 1280.  "If the parent fails to establish either prong of this test, the claim fails."  *People in Interest of C.B.*, 2019 COA 168, ¶ 26, 456 P.3d 92, 96.

¶ 34    We must remand for an evidentiary hearing to address an ineffective assistance of counsel claim if the parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of counsel's ineffectiveness.  *A.R.*, ¶ 63, 456 P.3d at 1281. But if the parent's allegations lack specificity, we may summarily deny the ineffective assistance claim.  *Id.*

### B.    The Indian Child Welfare Act

¶ 35    Father contends that counsel was deficient by failing to object to the lack of ICWA placement hearings and by not raising the Department's failure to use active efforts to enroll the children in the Cherokee Nation.  *See* §§ 19-1.2-101 to -132, C.R.S. 2025 (requiring compliance with federal ICWA statute).

### 1.    Additional Background

¶ 36    Mother declared that the children had no American Indian or Alaska Native heritage through her side of the family.  Father reported that his late father (paternal grandfather) was a member of the Cherokee Nation.

¶ 37    Early in the case, the Department reported that A.T. had been traced in the Cherokee Nation's tribal records and found to be related to persons associated with the Cherokee Nation, including

paternal grandfather, who was an enrolled member of the tribe. But the tribe reported that, based on current information, it could not recognize the child as an Indian child. The tribe later provided the same information regarding O.L.J. Based on this information, the juvenile court found that the children "may be" Indian children and ordered the Department to make active efforts and to send notices to the tribe.

¶ 38 The Department then unsuccessfully attempted to enroll the children in the Cherokee Nation. The Department filed a motion for ICWA determination, informing the court that the tribe had determined that the children were not Indian children and that efforts to enroll the children were unsuccessful.

¶ 39 The court ultimately determined that the Department made "diligent efforts" to obtain information from the Cherokee Nation and that "the requirements of [ICWA] ha[d] been complied with." But because those efforts were unsuccessful, the court determined that the children were not Indian children or eligible to enroll in an Indian tribe.

## 2.    Analysis

¶ 40    Once a juvenile court knows, or has reason to know, that a child is an Indian child, it must conduct a placement hearing before it can place the child in foster care.  25 U.S.C. § 1912(e) ("No foster care placement may be ordered in such proceeding" absent "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.").  Father contends that counsel was ineffective by failing to object to the lack of ICWA placement hearings.  But contrary to father's contention, the court did not "know[] or [have] reason to know that an Indian child [was] involved."  *See* 25 U.S.C. § 1912(a).

¶ 41    For ICWA's active efforts requirements to apply in a dependency and neglect proceeding, the case must, among other things, involve an Indian child.  *See People in Interest of A.G-G.*, 899 P.2d 319, 321 (Colo. App. 1995).  Active efforts require "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with [their] family."  25 C.F.R. § 23.2 (2025).  "'Indian child' means any unmarried person who is under

17

age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Section 19-1-126(1)(a)(II)(A)-(F), C.R.S. 2024, which was in effect at the time the children were placed in foster care, listed additional reasons to know that a child was an Indian child, but none of its provisions applied.

¶ 42 Regardless of whether the Department was required to make diligent or active efforts, we conclude that the Department used active efforts to enroll father and the children in the Cherokee Nation, but those efforts proved unsuccessful. Thus, the information before the juvenile court established that neither father nor the children were members of the Cherokee Nation and the children did not meet the definition of "Indian child." *See* 25 U.S.C. § 1903(4); *H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48 ¶¶ 61, 65, 535 P.3d 67, 81 (concluding that the child of a parent who believed she had Cherokee and Lakota Sioux heritage, but who never claimed tribal membership or that she was a member of a tribe, could not be the biological child of a member of an Indian

tribe).  Because the hearing requirement of 25 U.S.C. § 1912(e) did not apply, counsel was not ineffective for failing to raise it.

¶ 43    Second, father argues that the Department failed to make active efforts to enroll the children in the tribe.  The record, however, shows that the Department made many efforts to enroll the children in the Cherokee Nation.

¶ 44    Early in the case, the Department mailed the completed citizenship application for A.T. to the Cherokee Nation.  The Department later also completed an application for O.L.J.  To process the application, the Cherokee Nation required paternal grandfather's death certificate.  The Department acquired the certificate and mailed it to the tribe.  The Cherokee Nation then requested a copy of father's birth certificate.  The caseworker assisted father with requesting and paying for his birth certificate.  However, father's birth certificate did not identify paternal grandfather as his father.

¶ 45    The tribe informed the Department that it needed father to amend his birth certificate to include paternal grandfather.  The Department attempted to modify father's birth certificate, but the caseworker testified that the Office of Vital Records could not add

paternal grandfather to father's birth certificate because paternal grandfather was deceased.

¶ 46    Seven months before the termination hearing, the tribe stated that, because father's birth certificate could not be amended to add paternal grandfather, the children were not eligible to be enrolled in the tribe.

¶ 47    Based on this record, the Department met its obligations under ICWA, and father's counsel was not ineffective for failing to raise issues regarding the Department's enrollment efforts.

## C.    Reasonable Efforts

¶ 48    With respect to any purported lack of reasonable efforts, even if we were to assume, without deciding, that counsel's performance fell below the range of professionally competent assistance by not advocating that the Department perform certain additional efforts, father has not shown that he was prejudiced.  His assertions do not specifically show that, but for his counsel's failures to timely challenge the Department's purported lack of efforts, the result of the termination hearing would have been different.  *See A.R.*, ¶ 60, 456 P.3d at 1280.

¶ 49    First, father asserts that the Department never offered him family time in his home and never offered to have the children's in-home therapy conducted there.  He also contends that the Department made no efforts to expand his family time or lower the level of supervision.

¶ 50    Considering the juvenile court's findings regarding father's inability to acknowledge or meet the children's needs, as discussed above, father does not explain how his counsel's advocacy for in-home family time, expanded family time, or in-home therapy services would have changed the evidence at the termination hearing or the court's related findings regarding father's inability to meet the children's needs.  *See People in Interest of R.J.B.*, 2021 COA 4, ¶ 35, 482 P.3d 519, 525 (explaining that we will not consider a claim which is "merely a bald assertion without argument or development").

¶ 51    Next, father argues that his counsel should have objected to the Department's efforts because (1) father did not have input in scheduling the children's appointments; (2) the caseworker did not inquire with probation about the specifics of father's substance use treatment to confirm compliance and avoid duplicative services; and

(3) the caseworker did not verify with the FAS expert that father attended FAS training.

¶ 52    However, based on father's testimony at the termination hearing, scheduling was not a barrier to attending appointments. He testified that he did not attend medical appointments because he disagreed with the doctors. He also testified that he tried to access doctor's appointments online by trying "to make a password," but "wasn't able to complete that." The duplicative services of which father complains relate to substance abuse treatment, and he does not explain how raising this issue would have changed the outcome of the termination hearing; the court's termination judgment rested on father's inability to meet the children's needs, not on his substance use. And the record refutes father's FAS training argument. The caseworker testified that she attempted to contact the FAS expert to confirm father's participation in FAS training. Even if the caseworker had verified father's participation, the record still supported the court's conclusion that father could not meet the children's needs.

¶ 53    Finally, father contends that his treatment plans were not tailored to reunification, but to "the interests of the foster

placement," because the treatment plans required that parenting time be conditioned on "the preservation of any foster placement." Father does not cite, and we are not aware of, any authority that prohibits a treatment plan from providing family time in a manner that preserves children's stability in foster placement, especially considering that any disposition must serve the best interests of the child. *See* § 19-3-507(1)(a), C.R.S. 2025. Nor does father explain how this provision would have jeopardized reunification if he had complied with the treatment plans. As noted above, father does not challenge the appropriateness of his treatment plans. *See S.Z.S.,* ¶ 29, 524 P.3d at 1217.

¶ 54 We therefore conclude that father has not raised sufficiently specific and compelling allegations to constitute a prima facie showing of ineffective assistance of counsel. *See A.R.,* ¶ 63, 456 P.3d at 1281; *see also People v. Sherman,* 172 P.3d 911, 914 (Colo. App. 2006) (noting that an ineffective assistance claim that is too speculative will not satisfy the prejudice prong). Thus, we decline to disturb the termination judgment.

IV. Disposition

¶ 55 The judgment is affirmed.

JUDGE YUN and JUDGE SCHUTZ concur.